UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CHRISTOPHER MCVEY,

        Plaintiff,

v.                               Case No.  8:18-cv-2304-T-SPF

ANDREW M. SAUL,
Commissioner of the Social
Security Administration,

        Defendant.
_____/

**ORDER**

      Plaintiff seeks judicial review of the denial of his claims for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI").  As the Administrative Law Judge's ("ALJ's") decision was not based on substantial evidence and failed to employ proper legal standards, the Commissioner's decision is reversed and remanded.

     **I.**      **Procedural Background**

      Plaintiff applied for DIB on May 15, 2011, and for SSI on September 28, 2011 (Tr. 183–86, 210–16, 217–22, 233).  The Commissioner denied Plaintiff's claims both initially and upon reconsideration (Tr. 110–13, 128–30).  Per Plaintiff's request, the ALJ held a hearing at which Plaintiff appeared and testified (Tr. 77–109, 657–89).  Following the hearing, the ALJ issued an unfavorable decision finding Plaintiff not disabled and thus denied Plaintiff's claims for benefits (Tr. 41–59, 574–92).  Plaintiff later requested review from the Appeals Council, which the Appeals Council denied (Tr. 1–6).  Plaintiff appealed to the Middle District of Florida, Case No. 8:15-cv-829-T-JSS, which resulted in a reversal

and remand (Tr. 631–50).  The Appeals Council vacated the ALJ's first decision based on the court's remand order.  Plaintiff then filed a subsequent application for benefits, which the Appeals Council ordered consolidated with the original remanded claim (Tr. 564–69, 651–56).  The ALJ held a second hearing on December 13, 2017 (Tr. 514–63).  On May 16, 2018, the ALJ entered another unfavorable decision (Tr. 477–513).  Plaintiff did not file exceptions with the Appeals Council, and the ALJ's decision became the final decision of the Commissioner (Tr. 477–79).  Plaintiff timely filed a complaint with this Court (Doc. 1).  The case is now ripe for review under 42 U.S.C. §§ 405(g), 1383(c)(3).

## II.    Factual Background and the ALJ's Decision

Plaintiff, who was born in 1966, claimed disability beginning January 30, 2008 (Tr. 480).  He is a high school graduate with past relevant work experience as a store laborer, hand packager, and stock supervisor (Tr. 501).  Plaintiff alleges disability due to bipolar disorder, obsessive-compulsive disorder ("OCD"), neuropathy, learning disorders, panic and anxiety, and post-traumatic stress disorder ("PTSD") (Tr. 131).

In rendering her second administrative decision (the decision at issue in this appeal), the ALJ concluded that Plaintiff met the insured status requirements through June 30, 2013[1] and had not engaged in substantial gainful activity since January 30, 2008, his alleged onset date (Tr. 483).  After conducting a second hearing and reviewing the evidence of record, the ALJ determined Plaintiff had these severe impairments: mild degenerative disc disease; mild chronic obstructive pulmonary disease; affective disorders,

---

[1] This date is important for DIB purposes because Plaintiff must establish disability on or before his date of last insured to receive DIB benefits.  There is no such requirement for SSI.

including bipolar disorder and depression; anxiety disorders, including generalized anxiety and panic disorders; personality disorders, including avoidant and OCD; and PTSD (Tr. 483). Despite these severe impairments, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 483). The ALJ then concluded that Plaintiff retained the residual functional capacity ("RFC") to perform medium work with these relevant limitations:[2]

> He can understand, carry out, and remember simple instructions in two-hour increments sufficiently enough to complete an eight-hour workday. The claimant cannot perform work requiring a specific production rate, such as work performed on an assembly line. He can tolerate occasional changes in the work setting and occasional interaction with coworkers, supervisors, and the general public. The claimant would be off-task no more than five percent of the workday.

(Tr. 485).

In formulating Plaintiff's RFC, the ALJ considered Plaintiff's subjective complaints and determined that, although the evidence established underlying impairments that reasonably could be expected to produce the symptoms, Plaintiff's statements as to the intensity, persistence, and limiting effects of the alleged symptoms were not entirely consistent with the medical evidence and other evidence (Tr. 487). Considering Plaintiff's impairments and the assessment of a vocational expert ("VE"), however, the ALJ determined Plaintiff could not perform his past work (Tr. 501). Given Plaintiff's background and RFC, the VE testified that Plaintiff could perform other jobs

---

[2] Plaintiff's arguments on appeal pertain to the ALJ's evaluation of his mental impairments only; he does not challenge the ALJ's finding that Plaintiff maintains the physical RFC for medium work.

existing in significant numbers in the national economy, such as a hospital cleaner, automobile detailer, and a housekeeper (Tr. 502). Based on Plaintiff's age, education, work experience, RFC, and the testimony of the VE, the ALJ found Plaintiff not disabled (Tr. 502–03).

### III.   Legal Standard

To be entitled to benefits, a claimant must be disabled, meaning he must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities, which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Social Security Administration ("SSA"), to regularize the adjudicative process, promulgated the detailed regulations in effect. These regulations establish a "sequential evaluation process" to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found disabled at any point in the sequential review, further inquiry is unnecessary. 20 C.F.R. §§ 404.1520(a), 416.920(a). Under this process, the ALJ must determine, in sequence: whether the claimant is currently engaged in substantial gainful activity; whether the claimant has a severe impairment, *i.e.*, one that significantly limits his ability to perform work-related functions; whether the severe impairment meets or equals the medical criteria of 20 C.F.R. Part 404 Subpart P,

Appendix 1; and whether the claimant can perform his past relevant work. If the claimant cannot perform the tasks required of his prior work, step five of the evaluation requires the ALJ to decide whether the claimant can do other work in the national economy because of his age, education, and work experience. 20 C.F.R. §§ 404.1520(a), 416.920(a). A claimant is entitled to benefits only if unable to perform other work. *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); 20 C.F.R. §§ 404.1520(g), 416.920(g).

A determination by the Commissioner that a claimant is not disabled must be upheld if it is supported by substantial evidence and comports with applicable legal standards. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) (internal quotation marks omitted)); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). While the Court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions. *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citations omitted).

In reviewing the Commissioner's decision, the Court may not re-weigh the evidence or substitute its own judgment for that of the ALJ even if it finds that the evidence preponderates against the ALJ's decision. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). The Commissioner's failure to apply the correct law, or to give the reviewing court sufficient reasoning for determining that she has conducted the proper legal analysis, mandates reversal. *Keeton*, 21 F.3d at 1066. Review is thus limited to

determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct legal standards were applied.  42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

### IV.  Analysis

Plaintiff was 42 years old on his onset date in January 2008.  He has a history of mental illness dating to the tenth grade.  His treating and non-treating sources agree that Plaintiff suffers from bipolar disorder, depression, and anxiety (among other mental impairments) and has abused alcohol and benzodiazepines on and off since high school. He has attempted suicide multiple times, been Baker Act-ed at least twice, and numerous treatment providers have observed that his arms and torso are laced with scars from self-mutilation. His housing situation reflects his instability: for about a year during the relevant time period, Plaintiff lived in a tent in his friend's backyard after a fight with his roommate (Tr. 533).  In the main, Plaintiff's treatment notes and testimony speak to the episodic nature of chronic mental impairments – he had bad periods followed by relatively symptom-free intervals.

In this appeal, Plaintiff makes two arguments: (1) the ALJ erred in assessing the medical opinions of examining psychologists Claudia Ressel-Hodan, Psy.D. and Michael Eastridge, Ph.D.; and (2) the ALJ erred in assessing Plaintiff's RFC.  The Commissioner responds that the ALJ's decision is supported by substantial evidence.  Overall, the ALJ failed to apply the correct legal standards and the ALJ's decision is not supported by substantial evidence.

A. *Weight Accorded to Doctors*

In evaluating an individual's disability claim, an ALJ "must consider all medical opinions in a claimant's case record, together with other relevant evidence." *McClurkin v. Soc. Sec. Admin.*, 625 F. App'x 960, 962 (11th Cir. 2015)[3] (citing 20 C.F.R. § 404.1527(b)).[4] An ALJ has wide latitude to evaluate the weight of the evidence, but there is "no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision." *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005). Instead, the ALJ's decision must reflect that she has considered the medical evidence as a whole and that substantial evidence supports her conclusions. *Id.* (citing *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995)).

Under the regulations, the opinions of examining physicians are generally given more weight than non-examining physicians, treating more than non-treating physicians, and specialists more than non-specialist physicians. *See* 20 C.F.R. §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). A court must give a treating physician's opinions substantial or considerable weight unless "good cause" is shown to the contrary. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). This rule – the "treating physician rule" – reflects the regulations, which recognize that treating physicians "are likely to be the medical professionals most likely to provide a detailed, longitudinal picture of . . . medical

---

[3] Unpublished opinions of the Eleventh Circuit Court of Appeals are not considered binding precedent; however, they may be cited as persuasive authority. 11th Cir. R. 36-2.
[4] These regulations were amended effective March 27, 2017, after Plaintiff filed his applications. *See* 20 C.F.R. § 404.1520c. The amendments do not apply to Plaintiff's claim.

impairment." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). But the opinion of a one-time examining doctor merits no such deference. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004) (citing *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987)).

When a physician offers a statement reflecting judgments about the nature and severity of a claimant's impairments, that statement is considered a medical opinion. When weighing medical opinions, the ALJ must consider various factors, including: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much relevant evidence supports the opinion; (4) how consistent the opinion is with the record; and (5) whether the physician is a specialist making opinions about an area within his specialty. 20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)-(6); *see Davis v. Comm'r of Soc. Sec.*, 449 F. App'x. 828, 832 (11th Cir. 2011) ("these factors apply to both examining and [non-examining] doctors").

In the Eleventh Circuit, the ALJ must state with particularity the weight she assigns to a medical opinion and why. *Winschel v. Comm'r of Soc. Sec.,* 631 F.3d 1176, 1178-79 (11th Cir. 2011). This "explanation requirement applies equally to the opinions of treating physicians and non-treating physicians." *McClurkin*, 625 F. App'x at 962. Otherwise, "it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence." *Winschel*, 631 F.3d at 1179 (quoting *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981)).

### 1.  Dr. Ressel-Hodan

Dr. Ressel-Hodan examined Plaintiff at the behest of the Division of Vocational Rehabilitation for the State of Florida ("DVR") on June 19, 2008 (Tr. 298–302).  Although the examination occurred six months after Plaintiff's alleged onset date, it is the first medical opinion of record during the relevant time period.  Dr. Ressel-Hodan conducted a clinical interview and a mental status examination and administered nine standard psychological tests (Tr. 298).  Plaintiff told Dr. Ressel-Hodan about his very low energy levels and his self-described "irrational thoughts" (Tr. 299).  He was often sad but also had episodes when his mind raced so much he could not sleep.  He ruminated about death and dying, especially at night, and these thoughts triggered panic attacks, heart palpitations, shortness of breath, and dizziness (Id.).  He denied hallucinations and delusions.  He was afraid to leave the house and had flashbacks to being bullied in high school for being gay (Tr. 299-300).

Dr. Ressel-Hodan opined, "[b]ased upon the results of all information obtained in this evaluation . . . [Plaintiff] presents as a dually diagnosed individual.  He suffers from a long history of bipolar mood swings, panic attack[s], posttraumatic stress disorder, a social phobia, as well as a history of alcohol dependence" (Tr. 301). [5]  She continued: "There are no indications of psychotic symptoms.  Underlying personality characteristics are mainly attributed to avoidant tendencies" (Id.).  Plaintiff was "basically a bundle of nerves" with "underlying feelings of inadequacy, insecurity, and inferiority that motivate much of his

---

[5] A dually diagnosed individual is someone with a drug or alcohol addiction and some form of mental illness.

avoidant behaviors" (Tr. 300).  Dr. Ressel-Hodan's "impressions of [Plaintiff] from the interview" followed the results of the personality tests Plaintiff took as part of the examination (Tr. 300).

In the final section of Dr. Ressel-Hodan's report, titled "Implications for Vocational Planning" (Tr. 301-02), the psychologist emphasized Plaintiff's "functional deficits related to his emotional instability" and the fragility of Plaintiff's sobriety (he had stopped drinking a month earlier) (Tr. 301).  "He will be at risk for relapse unless he receives a lot of support in his attempt at abstinence.  He should involve himself regularly in AA," an activity that Dr. Ressel-Hodan worried would seem to Plaintiff "too stressful and overwhelming because of his personality style" (*Id.*).  Plaintiff "may have some difficulties adjusting to the pressure of being in a group setting where he will feel a need to speak" (Tr. 300-01).  Dr. Ressel-Hodan recommended Plaintiff seek psychiatric care "to help develop a regime of medication to stabilize him emotionally" with the hope of avoiding relapse (*Id.*).

Although the ALJ does not state the weight she assigned to Dr. Ressel-Hodan's opinion, she clearly discounted it.  After summarizing Dr. Ressel-Hodan's examination, the ALJ pointed out it was Plaintiff's only mental health treatment in 2008 and most of 2009.  According to the ALJ, the psychologist "relied, in large part, on statements from the claimant" and her report yielded "equivocal signs/findings on examination" (Tr. 488).  The ALJ decided to "provide[ ] some accommodation herein to account for certain aspects of this opinion" but found that Plaintiff "had not shown, however, that he would have difficulties in a group setting, as the weight of the collateral evidence does not show such

10

a limitation" (*Id.*).  The ALJ fashioned an RFC that included occasional interaction with coworkers and the general public, occasional changes in a work setting, and off-task time of five percent (Tr. 485).

The ALJ erred in weighing Dr. Ressel-Hodan's opinion for several reasons.  Most problematic is that the ALJ discounted the opinion for relying on Plaintiff's subjective symptoms, yet she overlooked that the psychologist administered personality tests that yielded results consistent with Plaintiff's clinical interview and mental status examination.[6]  The ALJ inconsistently applied this "subjective symptoms" rationale throughout her opinion.  For example, she assigned "some weight" to the March 2012 consultative examination conducted by Linda Appenfeldt, Ph.D. (Tr. 432-35).  Dr. Appenfeldt opined that Plaintiff was "able to perform work-related mental activities involving understanding, memory, sustained concentration and persistence, social interaction, and adaptation" (Tr. 435).  The ALJ weighed this examining psychologist's report more than the others, ostensibly because it was based on objective testing:  "Dr. Appenfeldt's mental status examination arguably represents the most comprehensive, objective evaluation in the record to this date, as it does not heavily rely on the claimant's subjective reports.  Instead, the examination includes various measures utilized to determine functioning[.]" (Tr. 492).  A closer look reveals that, while Dr. Appenfeldt asked Plaintiff to perform basic tasks like spelling "world" backward and forward, her

---

[6] Although the ALJ found that Dr. Ressel-Hodan's examination "yielded equivocal signs" (Tr. 488), she did not identify these equivocal findings or explain what she means by this. Similarly, the ALJ stated she "has provided some accommodations herein to account for certain aspects of this opinion" (Tr. 499) but did not clarify which aspects and why.

report also drew from Plaintiff's reported symptoms as well (Tr. 433).  Interestingly, Dr. Appenfeldt's objective testing appears less rigorous than that performed by Drs. Ressel-Hodan.

In any event, a "psychological assessment is by necessity based on the patient's report of symptoms and responses to questioning" and "it's illogical to dismiss the professional opinion of an examining psychiatrist or psychologist simply because that opinion draws from the claimant's reported symptoms." *Roundtree v. Saul*, No. 8:18-cv-1524-T-SPF, 2019 WL 4668174, at * 4 (M.D. Fla. Sept. 25, 2019) (quoting *Aurand v. Colvin*, 654 F. App'x 831, 837 (7th Cir. 2016)).  A mind cannot be x-rayed, and "there is no blood test for bipolar disorder." *Aurand*, 654 F. App'x at 837 and n.4.

The ALJ stated she relied primarily on Plaintiff's treatment records in fashioning Plaintiff's RFC; as discussed in the next section, these records are not inconsistent with Dr. Ressel-Hodan's conclusions.  Dr. Ressel-Hodan was not a treating source; her opinion was not entitled to great weight.  *See* 20 C.F.R. §§ 404.1502, 416.902.  But an ALJ may not arbitrarily reject or ignore uncontroverted medical evidence.  *See McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986) (administrative review must be of the entire record; ALJ cannot point to evidence that supports the decision but disregard other contrary evidence).  Here, the ALJ's reasons for discounting Dr. Ressel-Hodan's opinion lack substantial support.  As discussed below, this error is not harmless – it pervades the ALJ's RFC analysis and undermines the Court's ability to evaluate the ALJ's ultimate decision.

### 2. Dr. Eastridge

This segues into a discussion of the ALJ's decision to discount Dr. Eastridge's opinions, which is similarly flawed. Dr. Eastridge – like Dr. Ressel-Hodan – was an examining psychologist. He examined Plaintiff in March 2011 (Tr. 303–08) and September 2016 (Tr. 1473–78). In March 2011, Plaintiff told Dr. Eastridge he had fallen off the wagon after nine months of sobriety. He relayed his pattern of staying awake for two days straight and then crashing for two days. He recounted the deaths of friends, family, even pets – thoughts of which fueled unrelenting feelings of doom. The psychologist observed, "[h]e was clearly depressed. He said that he is always depressed" (Tr. 305). Plaintiff described a poor appetite and low energy. He told Dr. Eastridge, "I perseverate on my own death" (Tr. 305). And Dr. Eastridge noticed Plaintiff's "arms are covered with the scars from cuts. Some scars were old, some were new. He lifted his shirt to display scars from self-mutilation on his chest. In the past he has put out lit cigarettes on his forehead" (Tr. 305). Two months earlier, he had tried to hang himself. His roommate discovered him; he was Baker Act-ed (Tr. 305).

Plaintiff described rapid, racing thoughts, and Dr. Eastridge observed rapid speech. Plaintiff said he was being anxious in public and scared that store clerks will ask to help him, which would cause him to "freak" (Tr. 305). He displayed obsessive compulsive symptoms: he would lie awake at night trying to visualize the face of one person who had not hurt him, believing something bad would happen to him if he could not; he scratched his tongue with his fingernail fearing there was poison on his tongue; he obsessed over certain numbers, constantly adding house numbers together; and he said he "cannot stand

most people" and took offense if someone did not say "thank you" or observe other common courtesies (Tr. 305–06).

Dr. Eastridge diagnosed Plaintiff with bipolar disorder, panic disorder with agoraphobia, anxiety disorder, PTSD, OCD, alcohol abuse/dependence, and borderline personality disorder (Tr. 307). He concluded Plaintiff "needs intensive psychiatric and psychological treatment, on a long-term basis" (*Id.*). He opined that Plaintiff was not a good candidate for job training because of severe emotional distress and continued alcohol consumption. Even when stable, Dr. Eastridge stated, Plaintiff may struggle with sustained focus and attention, would likely work at a slower than average pace, and would require extra time to learn new skills. Plaintiff required a low-stress work environment with only moderate interaction with co-workers and zero contact with the public (Tr. 307).[7]

Dr. Eastridge examined Plaintiff again five years later, in September 2016 (Tr. 1473–78). In advance, Dr. Eastridge reviewed his 2011 report and the August 2015 report of consultative examiner Jeremy Zehr, Psy.D. (Tr. 1473).[8] Plaintiff confirmed many of the same symptoms – feelings of hopelessness, inability to sleep, low energy, flashbacks to childhood abuse, mood swings, and rapid speech. Dr. Eastridge administered two

---

[7] Indeed, in March 2011, DVR closed Plaintiff's case because Plaintiff's mental health had deteriorated to the point where he was unable to actively participate in job development activities (Tr. 436).

[8] Dr. Zehr opined Plaintiff "would not be able to interact appropriately" with others and would "not be able to respond appropriately to normal changes in a workplace environment" (Tr. 1405-07). True to form, the ALJ assigned this opinion "lesser weight" because it "relies more on the claimant's subjective presentation, versus other factors" (Tr. 500). Dr. Zehr administered similar objective testing as Dr. Appenfeldt.

14

psychological tests, the Conners' Continuous Performance Test-3 ("CPT3") and the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") (Tr. 1476). According to Dr. Eastridge, the results of the CPT3 demonstrated Plaintiff's inability to sustain attention and focus over 14 minutes (*Id*.). But Dr. Eastridge invalidated the results of the MMPI-2 because Plaintiff reported more of a variety and more severe symptoms than most psychiatric patients.

Dr. Eastridge diagnosed Plaintiff with bipolar disorder, PTSD, panic disorder with agoraphobia, OCD, borderline personality disorder, and alcohol dependence in sustained remission (Tr. 1477). He opined Plaintiff had marked limitations in social functioning and in concentration, persistence, and pace; could not maintain concentration and attention 85% of the time; could not consistently respond appropriately to co-workers, supervisors, and the public because of his level of anxiety and suspiciousness; could not consistently respond to changes in the workplace because of his OCD and anxiety; could not handle normal stress, concentration, and persistence requirements of a full-time job; and could not tolerate the stress of production quotas, deadlines, and normal pace work (*Id*.).

The ALJ did not assign Dr. Eastridge's March 2011 opinion explicit weight but clearly discredited it:

> The Administrative Law Judge does not necessarily agree with the limitation involving no work with the public, given the claimant's routine exhibition of intact social functioning on mental status examinations. Otherwise, and while the claimant may require extra time and attention to learn new skills, as well as the other considerations noted by Dr. Eastridge, this ultimate finding limits the claimant to the equivalent of unskilled work, along with various other accommodations anyway (Exhibit 4F).

(Tr. 499). Then, the ALJ assigned "little weight" to Dr. Eastridge's September 2016 opinion:

> There is the recent assessment from Dr. Eastridge too, at Exhibit 37F. To repeat, the opinion was obtained at the behest of Mr. Escarraz, though the claimant's attorney did not provide for the doctor's review many relevant mental health treatment records. This includes the first assessment from Dr. Ressel-Hodan in 2008, the evaluation conducted by Dr. Appenfeldt in March 2012, the records from treating psychiatrists like Drs. Jones, Kawliche, Desai, etc., the many treatment notes from nurse practitioners Weeks, Cintron, Brooks, Matea, Corwin, etc. the notes from the various counselors and social workers the claimant had seen, the lay observations from those at the Pinellas County Health Department, the few hospital records summarized above, etc. Moreover, the recent assessment by Dr. Eastridge focused, in large part, on the claimant's subjective reports . . . reports that have shown some inconsistencies. Regarding mental status examination signs/findings, and aside from the claimant's reports to Dr. Eastridge of subjective symptoms, the examining source indicated the claimant "moved slowly." Speech was "clear, but rapid." Yet, conversation was "logical." The claimant was "polite and cooperative." The claimant was "alert and oriented" too. On certain testing, the results "demonstrated high variability in reaction time consistency." The claimant "demonstrated impairment in his ability to sustain attention/focus over a 14-minute span of time." Yet, on other testing, the resulting profile was invalid "due to [the claimant's] excessive reporting of severe symptoms." The claimant "reported more various symptoms and more severe symptoms than do most psychiatric patients" (Exhibit 37F). For these reasons, this recent report from Dr. Eastridge receives little weight.

(Tr. 499–500).

In short, the ALJ discounted Dr. Eastridge's opinions because his findings relied on Plaintiff's statements and contradicted Plaintiff's treatment records (Tr. 488, 500). Neither reason is sound. As mentioned above, a psychological assessment necessarily draws from the claimant's reported symptoms. And, Dr. Eastridge did not rely solely on Plaintiff's subjective symptoms – he performed objective psychological testing, which showed Plaintiff was markedly limited in his ability to concentrate and interact with others (Tr. 1476-78). The ALJ pointed out that Plaintiff's MMPI-2 test was invalid because he

reported too many symptoms.   But the MMPI-2 was just one test Dr. Eastridge administered, and Dr. Eastridge fashioned his report to account for the fact that the test yielded invalid results.   The CPT3 test, designed to measure Plaintiff's ability to sustain attention and focus over time, produced what the psychologist considered valid results (Tr. 1476).   So, Plaintiff's erratic performance on the MMPI-2 is not a logical reason to discount what Dr. Eastridge's opinion says about Plaintiff's limitations.[9]

Second, the ALJ erred in finding Dr. Eastridge's opinion inconsistent with Plaintiff's treatment records.   The ALJ characterized Dr. Eastridge's September 2016 assessment as "poorly informed":

> The claimant's attorney did not provide, for whatever reason, the other relevant mental health treatment records, including the first assessment from Dr. Ressel-Hodan in 2008, the evaluation conducted by Dr. Appenfeldt in March 2012, the reocrds from treating psychiatrists like Drs. Jones, Kawliche, Desai, etc., the many treatment notes from nurse practitioners Weeks, Cintron, Brooks, Matea, Corwin, etc., the notes from the various counselors and social workers the claimant had seen, the lay observations from those at the Pinellas County Health Department, the few hospital records summarized above, etc.

(Tr. 495)   Under the regulations, when deciding the proper weight to give medical opinions, one factor to consider is "the extent to which a medical source is familiar with the other information in [the] case record. . . ." 20 C.F.R. § 404.1527(c)(6).   This Court's

---

[9] Another reason the ALJ discounted Dr. Eastridge's 2016 opinion is because Plaintiff's attorney asked for it (Tr. 500).   Standing alone, this does not undermine the opinion's evidentiary value.   *Tavarez v. Comm'r of Soc. Sec.*, 638 F. App'x 841, 847 (11th Cir. 2016) ("the mere fact that a medical report is provided at the request of counsel or, more broadly, the purpose for which an opinion is provided, is not a legitimate basis for evaluating the reliability of the report") (quotation omitted); *Hickel v. Comm'r of Soc. Sec.*, 539 F. App'x 980, 987 (11th Cir. 2013) (same).   While this was only one of the reasons the ALJ discounted Dr. Eastridge's second opinion, the ALJs other reasons are not substantially supported.

review of the "other relevant mental health treatment records" the ALJ references, however, reveals that Dr. Eastridge's opinions are not inconsistent with them (*see* Tr. 500).

For example, the ALJ mentions the opinions of psychiatrists Karl Jones, M.D. and Boris Kawliche, M.D. Dr. Jones treated Plaintiff twice in October 2009. He described Plaintiff as depressed, anxious, avoidant, sleepless, and withdrawn (Tr. 339-41). He had slow speech and showed poor insight and judgment. Dr. Jones noted Plaintiff's past suicide attempts and his history of self-mutilation. He diagnosed Plaintiff with bipolar disorder and depression, with a guarded prognosis (Tr. 336-44). Dr. Kawliche treated Plaintiff about a year later (Tr. 331). He diagnosed bipolar disorder type 2, PTSD, panic disorder, OCD, and alcohol dependence in full remission. After some encouragement by licensed mental health counselor Lynn Bonner of Dr. Kawliche's office, Plaintiff agreed to a treatment regimen of Prozac, Xanax, and Seroquel (Tr. 326, 327, 328, 332, 333). As the ALJ noted, Dr. Kawliche observed that Plaintiff was in no acute distress and was cognitively grossly intact (Tr. 490), and Ms. Bonner stated Plaintiff was "very engaged" and "making progress" (Tr. 489). This is not a complete picture. Dr. Kawliche cautioned in October 2010 that Plaintiff "appears to have more serious impairment of his functioning than I first estimated" (Tr. 327). And Ms. Bonner was commenting on Plaintiff's habit of showing up for appointments on time, not his ability to function in a group setting. Indeed, in January 2011, shortly after Dr. Kawliche treated Plaintiff, Plaintiff was Baker Act-ed with suicidal thoughts of cutting himself and overdosing. He was stabilized and discharged two days later.

18

From January 2011 until May 2016, Plaintiff received regular mental health treatment from numerous psychiatric nurse practitioners at Suncoast Center, including Judith Mattea, Sandra Weeks, Susan Cintron, Aaron Brooks, and Lois Corwin.  Under the regulations applicable to Plaintiff's claim, a nurse practitioner was not an "acceptable medical source" for purposes of establishing an impairment.  20 C.F.R. §§ 404.1513(a), 416.913(a).  However, a nurse practitioner was an "other" medical source used "to show the severity of  impairments and how the impairments affect ability to work. 20 C.F.R. § 404.1513(d)(1).  The ALJ culled their records for observations such as:  Plaintiff had fair eye contact, intact memory and concentration, was alert and compliant, had no gross cognitive deficits, was oriented to time, place, and person, and had normal speech.[10] (*see* Tr. 416, 417, 419, 420, 422, 424, 437,473, 488, 1209, 1213, 1215).  At most, these statements create a trivial tension with Drs. Ressel-Hodan and Eastridge's conclusions, not a genuine inconsistency.

To be sure, Plaintiff's treating nurse practitioners recorded some mental status examinations that were normal and some that were not.  And at each visit, Plaintiff appeared better on some parameters than others.  But, fleshed out, these same sources also found Plaintiff had decreased insight and judgment (Tr. 406); he was restless and anxious (Tr. 417); his speech was circumstantial and tangential (Tr. 417); he had a depressed mood and flat affect (Tr. 422); he was "hypertalkative" (Tr. 475); he was dysphoric (Tr. 1183).

---

[10] In any event, the thrust of Plaintiff's claim is that his bipolar disorder and other mental impairments disable him primarily by affecting his mood, affect, and interpersonal relationships – not his cognition and memory.

They noted he was self-isolating, had anger outbursts, and reported being awake for days at a time (Tr. 1105). By February 2016, Plaintiff was living in a tent and then an outhouse with his dogs in his friend's backyard (Tr. 1464, 1470).[11]

The bulk of the medical evidence supports the notion that Plaintiff's mental impairments continued well beyond his periods of stability. In this sense, the treatment notes reflect the episodic nature of Plaintiff's bipolar disorder. Presented with a longitudinal evidentiary record pointing to debilitating mental illness, however, the ALJ picked favorable portions of medical records authored during Plaintiff's periods of stability and discounted the records that provided depth to Plaintiff's condition. By picking and choosing, the ALJ avoided the regulatory demand that she considers the whole person and the combined effects of his impairments over the relevant time. 20 C.F.R. § 404.1523. The Court cannot say that this error is harmless without re-weighing the evidence, which would invade the province of the ALJ. Unfortunately, this is a situation where "it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence." *Winschel*, 631 F.3d at 1178-79. The case is remanded to the ALJ to properly assess the weight given to Drs. Ressel-Hodan and Eastridge's opinions and to provide sufficient support for the Court's review.

---

[11] Notably, the ALJ found Plaintiff's substance abuse to be a non-severe medically determinable impairment because (according to the ALJ) Plaintiff abused alcohol and benzodiazepine only between May 2010 to April 2011, less than a 12 month stretch (Tr. 490-91). To be sure, some records indicate Plaintiff was drinking regularly while others indicate he had maintained sobriety for extended periods. The Court's review of Plaintiff's medical records reveals that his symptoms continued even when he claimed he was not abusing drugs or alcohol.

### B.  RFC

While it is unnecessary to address the remaining issue – whether the ALJ's RFC analysis is supported by substantial evidence – the Court points out that on remand, the ALJ may decide not to include all the limitations these psychologists imposed.  An RFC is an assessment based on all relevant medical evidence and other evidence of Plaintiff's ability to work despite his impairments.  *Castle v. Colvin*, 557 F. App'x 849, 852 (11th Cir. 2014) (citing *Lewis*, 125 F.3d at 1436).  An ALJ does not have to include limitations in the RFC she properly discounts.  The ultimate responsibility for assessing Plaintiff's RFC rests with the ALJ.  *See Bloodsworth*, 703 F.2d at 1239.

### V.  Conclusion

Accordingly, after consideration, it is hereby

ORDERED:

1.   The decision of the Commissioner is REVERSED and REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) to the Commissioner for further administrative proceedings consistent with this Order.

2.   The Clerk is directed to enter final judgment in favor of the Plaintiff and close the case.

ORDERED in Tampa, Florida, on May 21, 2020.

SEAN P. FLYNN
UNITED STATES MAGISTRATE JUDGE

21